**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

INSIDORO DeLEON,

                                        Plaintiff,

            v.                                                  No. 10-CV-863
                                                                  (MAD/DRH)

LESTER N. WRIGHT, Deputy Commissioner,
Chief Medical Officer, DOCS; MARY ANNE
GENOVESE, MD, Medical Director of Infirmary,
Shawangunk Correctional Facility; and S. DAS,
Medical Doctor, Shawangunk Correctional
Facility,
                                        Defendants.
_____

**APPEARANCES:**                        **OF COUNSEL:**

INSIDORO DeLEON
93-A-3163
Plaintiff Pro Se
Shawangunk Correctional Facility
Post Office Box 700
Wallkill, New York 12589

HON. ERIC T. SCHNEIDERMAN          DEAN J. HIGGINS, ESQ.
New York State Attorney General    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

                    **REPORT-RECOMMENDATION AND ORDER**[1]

        Plaintiff pro se Isidoro DeLeon ("DeLeon"), an inmate in the custody of the New York

State Department of Correctional and Community Services ("DOCCS"), brings this action

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

pursuant to 42 U.S.C. § 1983 alleging that defendants, a Deputy Commissioner and two

doctors, violated his constitutional rights under the First and Eighth Amendments.  Compl.

(Dkt. No. 1).  Presently pending are DeLeon's motion and defendants' cross-motion for

summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt Nos. 44-46.  Both motions are

opposed.  Dkt. Nos. 45, 50.   For the following reasons it is recommended that DeLeon's

motion be denied and defendants' cross-motion be granted.


### I.  Background[2]

### A.  Medical Treatment

### 1.  Dr. Genovese

DeLeon was an insulin dependant, non-compliant, diabetic.  DeLeon Dep. (Dkt. No.

45-7)[3] at 32; Genovese Decl. (Dkt. No. 45-13) ¶ 6; Dkt. No. 46 at 42 (refusing to accept

medication changes); 32 (non-compliance with diet); 22, 24, 28, 29, 172 (refusing finger

sticks and treatment); 79-117, 120-31, 135-43, 145-54, 159-71, 173-205 (medication

provider forms showing the provision of insulin and finger sticks from 2008 through 2010).

In order to receive his daily insulin shots, DeLeon saw medical staff twice daily.  DeLeon

Dep. at 31-32.  Defendant Dr. Genovese was the Facility Health Service Director at

---

[2] Both DeLeon and defendants have provided medical records, water testing
results, and grievances on the pending motions.  The documents are duplicates of one
another.  Moreover, the defendants submissions incorporate additional documents in
these categories resulting in a more comprehensive submission.  Thus, for efficiency, with
respect to these documents citation will be made to defendants' attachments only (Dkt.
Nos. 45-46).

[3] As the errata sheet is separately paginated, for ease, citation will be made to the
page number indicated in the heading with the docket number as opposed to the separate
pagination indicated on the individual pages of the transcript.

Shawangunk until May 8, 2009, when she left that position for another in the medical department at Sing-Sing Correctional Facility.  Genovese Decl. (Dkt. No. 45-13) ¶ 3.  Prior to her departure, Dr. Genovese treated DeLeon for his various medical conditions. Genovese Decl. ¶¶ 5, 10.

DeLeon alleges that between 2008 and 2010, the water supply at Shawangunk became tainted and discolored on several occasions.  Compl. at 7, ¶ 1.  DeLeon was forced to ingest this water.  Id.  On March 9, 2009, DeLeon complained of a stomach ache and diarrhea, due to the water.  Genovese Decl. ¶ 12; Dkt. No. 46 at 292.  DeLeon's vitals were taken and he was given medication by a nurse to relieve his upset stomach and diarrhea. Genovese Decl. ¶ 12; Dkt. No. 46 at 292.  DeLeon made similar complaints of vomiting, diarrhea and stomach pains the following day, as well as having a bump on his finger, and was giving additional medication to relieve his upset stomach and diarrhea and advised to soak his finger.  Dkt. No. 46 at 30; see also Genovese Decl. ¶ 15 ("On March 10th, [DeLeon] was given Diamode (for diarrhea), Alamage (an antacid) and Tylenol for pain.").  DeLeon again made similar complaints, with identical treatment and recommendations, on March 16, 2009.  Dkt. No. 46 at 30.  DeLeon was scheduled for an appointment with a doctor on April 6.  Id.  However, DeLeon did not complain of belching or burning which would have been an indication of a condition such as H. Pylori.[4]  Genovese Decl. ¶¶ 13-14.  Instead, Dr. Genovese and her staff provided tests and medication to treat the symptoms for which

--------------------

[4]Helicobacter Pylori Infection, or H. Pylori, "is a type of coliform bacteria which originates in animal intestines."  Quezada v. Ercole, No. 09 Civ. 2832(DLC), 2011 WL 3251811, at *3 (S.D.N.Y.,  July 29, 2011).

DeLeon complained.  Genovese Decl. ¶ 13.[5]

On April 6, 2009, Dr. Genovese saw DeLeon for a check on his diabetes and hypertension, and DeLeon admitted to being non-compliant with his diet and stated he had "stomach pains", diarrhea, and slightly black stool.  Genovese Decl. ¶ 17; ; Dkt. No. 46 at 31-32.  During examination, Dr. Genovese determined DeLeon was stable and noted no complaints of belching or pain or burning in the epigastric area[6], which might indicate an H. Pylori condition."  Genovese Decl. ¶ 18.  Stool cultures were ordered, addressing DeLeon's primary complaint of diarrhea, including tests for ova, parasites, and occult blood, as well as a blood test.  Id. ¶¶ 19, 23; Dkt. No. 46 at 13.  On April 10, DeLeon returned the samples on and April 12 and 15 the results came back negative for ova, parasites, and blood.  Genovese ¶¶ 20-22; Dkt. No. 46 at 13, 224, 227-28 (lab results).   DeLeon disagreed with the defendants failing to test him earlier for H. Pylori by performing an x-ray or blood test, as opposed to running stool cultures.  DeLeon Dep. at 33, 36, 87.  Ultimately DeLeon testified that while Dr. Genovese was trying to provide help, "she was wrong," in her diagnosis and treatment.  DeLeon Dep. at 35.

DeLeon requested an H. Pylori test on May 8, 2009, the same date Dr. Genovese left her employment at Shawangunk.[7]  Genovese Decl. ¶¶ 12, 24; Dkt. No. 46 at 14.  However,

––––––––––––––––––––

[5] At some time during his treatment, DeLeon was no longer prescribed certain medications as Dr. Genovese believed his symptoms were a side effect of those medication.  DeLeon Dep. at 35.

[6] The epigastric region is "the upper middle region of the abdomen . . . ."Dorland's Illustrated Med. Dictionary 1441 (28th ed. 1994).

[7] The presence of H. Pylori can be determined by a blood, breath or stool test, as well as by an endoscopy.  Genovese Decl. ¶¶ 29-31.

4

the medical department pursued other treatments to address DeLeon's symptoms.

Genovese Decl. ¶ 13.  On July 17, 2009, a nurse practitioner order the H. Pylori test and

the results were collected on July 23, 2009.  Genovese Decl. ¶ 26; Dkt. No. 46 at 16.  On

July 25, 2009, the results were returned as positive and DeLeon was started on antibiotics

on September 14, 2009.  Genovese Decl. ¶ 27; Dkt. No. 46 at 18.  DeLeon asserts that his

positive test results were not timely reported to him as he had to request his records

through a Freedom of Information Law (FOIL) request because medical personnel had not

advised him yet of the outcome.  DeLeon Dep. at 46-47.  DeLeon was provided with a

course of antibiotics for his H. Pylori, but the medication was stopped so that a subsequent

test could be conducted prior to beginning another course of treatment.  Id. at 57-59, 60-61,

88.  Iwhen DeLeon complained, the medical department informed him that it was against

their policies to provide persistent antibiotics to inmates.  Id. at 59.

Dr. Genovese stated that a "H. Pylori infection occurs when . . . Helicobacter pylori

[bacteria] infects a person's stomach, usually during childhood.  H. Pylori is present in about

half of the people in the world."  Genovese Decl. ¶ 28.  "Risk factors for contracti[on] . . .

include (1) living in crowded conditions; (2) living without a reliable supply of hot water and

(3) living with someone who has H. Pylori . . . ."  Id. ¶ 32; but see DeLeon Dep. at 30

(explaining that H. Pylori is not contagious).  Dr. Genovese explained that most people who

have the bacteria do not realize it because often they do not get sick from it.  Genovese

Decl.  ¶ 33.  Furthermore, Dr. Genovese testifies that Cryptosporidicus have no relation to

H. Pylori, so presence of the former is not indicative of presence of the latter.  Id. ¶ 39.

DeLeon contends that a complication with his left eye was also a side effect of the H.

Pylori.  DeLeon Dep. at 53-54.  On July 1, 2009, DeLeon had an eye examination to check

his retinopathy.  Dkt. No. 46 at 15.  In the two weeks following the appointment, DeLeon

had pain, itching, swelling, and blurred vision.  Id. at 15, 56-57 (grievance from DeLeon

contending that he had been seen multiple times by medical staff for these problems,

despite the medical notes indicating otherwise).  On July 13, 2009, at a sick call, DeLeon's

eyes were tested for scratches and none were found.  Id. at 15.  He was given drops by

medical staff.  Id.  On July 17, DeLeon was seen for his diabetic follow-up and there was

nothing further discussed about his eye.  Id. at 55.  DeLeon was scheduled for, and

attended, further follow-up appointments for treatment of his retinopathy.  Id. at 7-8, 11, 16,

46, 55, 60-62.  DeLeon never asked nor received confirmation from his specialist that his

eye problems were a symptom of or related to his H. Pylori.  DeLeon Dep. at 53-54.


### 2.  Dr. Das

In 2009, Dr. Das was employed "as a 'per-diem' physician for [DOCCS]," working as a

part-time doctor filling in for the facility physicians when they took time off.  Das Decl. (Dkt.

No. 45-14) ¶ 3.  Dr. Das treated DeLeon on one occasion, August 18, 2009, in conjunction

with his eye consultation.  Id. ¶¶ 4-5.  Due to DeLeon's diabetes, he was also suffering from

"retinopathy (any non-inflammatory disease of the retina) . . . ."  Id. ¶ 5; see also Dkt. No. 46

at 33 (entry in medical records from July 9, 2008 diagnosing DeLeon with diabetic

retinopathy).  Dr. Das discussed a follow-up eye appointment with DeLeon regarding his

retinopathy, as well as cholesterol management to prevent further visual complications.

Das Decl. ¶¶ 6-7.  Dr. Das ordered a lab test to check DeLeon's cholesterol as well.  Id. ¶ 8.

On that occasion, DeLeon did not speak of H. Pylori, and Dr. Das had no knowledge about

test results related to it.  Id. ¶¶ 10-11.  DeLeon disputes these facts claiming he saw Dr.

6

Das and brought to his attention the H. Pylori symptoms, but Dr. Das did nothing to help him.  DeLeon Dep. at 42-43.

### 3.  Dr. Wright

DeLeon was never examined by Dr. Wright.  DeLeon Dep. at 43.  However, as the DOCCS Chief Medical Officer, DeLeon asserts it was his responsibility to ensure that proper procedures were being followed and appropriate policies being made.  DeLeon Dep. at 43-44.

### B.  Water Quality[8]

Shawangunk shares its water supply with a neighboring correction facility, Wallkill. Kelly Decl. (Dkt. No. 45-12) ¶ 4.  The water supply originated from Wallkill as that facility maintained the filter plant and wells used to generate the water.  Id. ¶ 8.  Testing of the water was done regularly, generally by an independent laboratory.  Id. ¶ 9.  "The water was and is tested on a daily basis for chlorine residual, iron and turbidity by [Shawangunk] . . . facility staff and, . . . water samples are also collected by an independent laboratory and tested to ensure that the facility water supply . . . is in compliance with applicable standards."  Id. ¶ 16; see also Dkt. No. 45-8 at 6, 11-113 (copies of test results from

---

[8] Approximately 200 complaints about the water quality at Shawangunk were lodged by inmates in the winter of 2005.  Dkt. No. 1-2 at 52-54.  The inmates were addressed by the Superintendent and Dr. Genovese, both explaining that the water was meeting the correct state compliance standards and no medical conditions had arisen which were linked to the ingestion of allegedly contaminated water.  Id.  Dr. Genovese explained that if there was bacteria in the water, both staff and inmates would be sick as the staff also drink and use the water daily.  Id. at 53.  Dr. Genovese further explained she would be ill as she used the water constantly to wash her hands throughout the day.  Id.

Shawangunk staff, the Department of Health, and independent testing agency
Environmental Lab Works), Dkt. No. 45-8 at 8, 16, 30, 36, 46,56 (explaining importance of
turbidity levels and acceptable values and monthly reports from the New York State
Department of Health (DOH) for the first half of 2006 showing average turbidity levels of
0.41% or lower, values within the acceptable range).

During the time in question, where the water supply was allegedly contaminated, the
annual water quality report indicated that the water was in compliance with all DOH
standards and all state drinking water operating, monitoring, and reporting requirements.
Kelly Decl. ¶¶ 14-15; Dkt. No. 45-8 at 1-5 (Annual Drinking Water Quality Report for 2009).
The only test that was abnormal was that for iron, which represented an aesthetic concern
about the color and taste of the water, and not a health and safety concern.  Kelly Decl. ¶
19; Dkt. No. 45-8 at 1, 3.


### C.  Grievances and Retaliation

In March 2009, DOCCS investigated a consolidated grievance filed by DeLeon and
three other inmates which was filed on March 11, 2009, about the integrity of the water
supply.  Dkt. No. 45-4 at 3-4, 9-13.  The grievance was ultimately denied, noting that water
quality was in conformity with the DOH guidelines as confirmed by testing by Shawangunk,
an independent laboratory, and the DOH.  Dkt. No. 45-4 at 5-6, 14, 17-21, 31.  The inmates
were informed that the discoloration of the water was caused by the wells being turned on
and off to accommodate a construction project; however, the water's potability was still
appropriate and statements otherwise were untrue.  Id. at 4-5, 32-34.   A review of the

medical charts determined that "no inmate was found to have a malady with correlation to the water."  Dkt. No. 45-4 at 6, 16, 18.  Despite appeals from each inmate, the decision was ultimately affirmed and the grievances denied.  Dkt. No. 45-4 at 32-37.  DeLeon also unsuccessfully filed a grievance in July 2009 about the care he received in conjunction with his eye (Dkt. No. 45-5) as well as another in September 2009 for the alleged inadequate medical care he received regarding the allegedly delayed diagnosis and treatment of his H. Pylori (Dkt. No. 45-6).

### D.  Court of Claims Action

On September 8, 2009, DeLeon filed an action in the New York Court of Claims alleging, as here, that he was made ill by contaminated water and received deliberately indifferent medical treatment by the staff at Shawangunk.  Dkt. No. 45-9[9]; DeLeon Dep. at 68-75 (acknowledging that the factual underpinnings of the two actions are the same).  The claim was litigated via video-conference on November 3, 2010.  Dkt. No. 45-10.  At the conclusion of DeLeon's case, defendant successfully moved for dismissal due to DeLeon's failure to establish a *prima facie* claim.  Id.  On December 16, 2010 the Court of Claims issued a judgment stating in relevant part that after "having heard the proofs and allegations of the parties and, at the conclusion of the trial, a bench decision [was] . . . rendered on the record granting the defendant's motion to dismiss the claim for failure to prove a *prima facie* case . . . ."  Dkt. No. 45-11 at 2.

---

[9] A comparison of the Court of Claims action with this action indicate that the allegations are essentially identical.  Compare Dkt. No. 45-9 ¶¶ 3, 5, 6, 7 with Compl. 7(A) ¶¶ 1-3, 9, 10.

## II. Defendants' Cross-Motion

DeLeon alleges that his First Amendment rights were violated when defendants failed to provide him medical treatment in retaliation for him filing grievances against them. DeLeon also contends that his Eighth Amendment rights were violated when defendants failed to (1) remedy the contaminated water supply and (2) provide him with sufficient medical treatment regarding the ailments he alleged to have acquired due to the water. Defendants seek dismissal because (1) personal involvement has not been established; (2) DeLeon's claims are meritless; and (3) issue preclusion bars Deleon's claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact

could find in favor of the non-moving party for a court to grant a motion for summary

judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994);

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must

afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185,

191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district

courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings

liberally.'" (citations omitted))..  However, the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact.

Anderson, 477 U.S. at 247-48.


### B. Personal Involvement

Defendants contend that DeLeon has failed to establish that the named defendants

were personally involved in any of the alleged constitutional deprivations.  "'[P]ersonal

involvement of defendants in alleged constitutional deprivations is a prerequisite to an

award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)

(quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory

officials may not be held liable merely because they held a position of authority.  Id.; Black

v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be

considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;

>  (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[10]

## 1. Dr. Wright

DeLeon alleges that Dr. Wright, as the then Deputy Commissioner and Chief Medical Officer of DOCCS, knew or should have known of the alleged contaminated water supply and its effects on the inmates' health at the facility.  A position in a hierarchical chain of command, absent something more, is insufficient to support a showing of personal involvement.  Wright, 21 F.3d at 501.  Thus, Wright, as chief medical officer for DOCCS,

---

[10] Various courts in the Second Circuit have considered how, if at all, the decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), affected the five Colon factors which were traditionally used to determine personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (holding that Iqbal did not eliminate Colon's personal involvement standard).

cannot be held liable solely because he held a supervisory position over other defendants. DeLeon does not specifically contend that Wright was directly involved or had knowledge of the alleged constitutional violations. Additionally, there is nothing in the complaint that can be construed as a contention asserting negligent supervision. Accordingly, defendants' motion as to Wright should be granted on this ground.

### 2. Dr. Genovese

There is no dispute that Dr. Genovese was directly involved in DeLeon's care, until she left the facility to take a different position on May 8, 2009. DeLeon has failed to proffer evidence that Dr. Genovese was involved in his medical care after that point. Accordingly, Dr. Genovese was personally involved with DeLeon's care through May 8, 2009. Anything that occurred after that date, however, is outside of the time period when Dr. Genovese was personally involved in DeLeon's medical diagnoses, care, or overall treatment. Therefore, defendants' motion should be denied to all events occurring prior to May 9, 2009, but granted as to events occurring thereafter.

### 3. Dr. Das

While the frequency with which Dr. Das saw and treated DeLeon is in dispute, it is uncontroverted that Dr. Das was directly involved with DeLeon's medical care on at least one occasion. This suffices to raise an issue of fact as to Dr. Das' personal involvement in DeLeon's care. Accordingly, defendants' motion on this ground should be denied.

## C.  Retaliation

DeLeon claims that defendants retaliated against him by failing to provide him with adequate medical treatment because he filed grievances related to the water condition and medical treatment he subsequently received.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."  Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Therefore, conclusory allegations alone are insufficient. Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued

14

with full discovery.")).

In this case, DeLeon has failed to allege facts sufficient to support a retaliation claim. DeLeon's actions in filing grievances constitutes an activity protected by the First Amendment.  However, DeLeon alleges no facts other than conclusory allegations to demonstrate that the filing of his grievances was a substantial factor in any defendants' alleged deliberate indifference.  These conclusory allegations, without more, are insufficient to maintain the present claims.  Id.  Moreover, as discussed infra, the record further belies such contentions as it is replete with evidence showing that DeLeon received consistent medical care for his diabetes and relevant complications and the water supply was not contaminated.  Moreover, there is no verifiable and non-conclusory evidence showing any type of causal connection between the water and inmate illness.

 Accordingly, defendants' motion should be granted as to these claims.


### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970); Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

## 1. Conditions of Confinement

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer, 511 U.S. at 832. This includes the right to "receive adequate food, clothing, shelter, and medical care . . . . " Id. (citations omitted).  As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468,  480 (2d Cir. 1996) (citations omitted).  Thus, "a prisoner may prevail only where he proves both an objective element – that the prison officials' transgression was sufficiently serious– and a subjective element – that the officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone . . . [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).  However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

16

unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

In this case, DeLeon has failed to raise a question of fact surrounding the cleanliness of the water.  Defendants do not dispute that provision of safe drinking water is a requirement under the Eighth Amendment.  However, DeLeon has failed to demonstrate that the water source was objectively unsafe.  "Speculation and conclusory allegations, unaccompanied by evidentiary support, do not suffice to avoid summary judgment." MacLeod v. Kern, 379 F. Supp. 2d 103, 109 (D. Mass. 2005).  DeLeon's assertions that the water was objectively harmful have been contradicted by affidavits from the DOCCS plant manager, an expert in water treatment, as well as test results from employees of the facility, an independent laboratory, and the Department of Health and an annual water quality report which all consistently indicated that the water levels were within normal limits.  DeLeon proffers affidavits from other inmates claiming similar observations about the water contamination, who also allegedly suffered from H. Pylori, but such affidavits are unsupported opinions proffered by laypersons.  Without an expert opinion to contradict the clear results of the water records, DeLeon's claim must fail. MacLeod, 379 F. Supp. 2d at 108 (granting summary judgment due to conclusory and unsupported allegations where an inmate's conditions of confinement claim, based on contaminated water, "speculate[d] that an independent laboratory could find the water at the facility to be contaminated but the water quality records fail[ed] to bear out [t]his claim."); Perez v. Hawk, 302 F. Supp. 2d 9, 22 (E.D.N.Y. 2004) (granting motion to dismiss where inmate, who alleged contaminated water

17

made him ill, "fail[ed] to allege a clearly stated causal link between the water supply and his symptoms."). No such expert opinion has been proffered by DeLeon.

Accordingly, defendants' motion as to this claim should be granted on this ground.


### 2.  Medical Care

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms

of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." <u>Sonds v. St. Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, DeLeon contends that defendants failed to provide him with appropriate medical care because they did not quickly discover the H. Pylori infection despite their alleged knowledge of the contaminated water. Defendants do not dispute the objective prong of the analysis, that DeLeon's infection was a serious medical condition. Defendants contend, however, that DeLeon has failed to establish the subjective prong as to any defendant.

### a. Dr. Genovese

Dr. Genovese was involved in DeLeon's care until she left the facility May 8, 2009. DeLeon began complaining of stomach problems on March 9, 2009. Thereafter, Dr. Genovese provided DeLeon with treatment for his reported symptoms for the following two months. She provided medication to relieve his diarrhea and the pain associated with it and ordered stool cultures, which were negative. Dr. Genovese states that based upon the symptoms DeLeon was sharing, they were not indicative of H. Pylori and, therefore, she did not test him for it. DeLeon does not dispute that he was provided with medication or the stool sample cultures, and the medical records confirm the same. Thus, these facts refute any claims of deliberate indifference as Dr. Genovese was providing what she deemed to be appropriate treatment. To the extent that DeLeon disagrees with the course of Dr. Genovese's diagnosis and treatment from March until May, such disagreements are insufficient to state an Eighth Amendment claim. <u>Chance</u>, 143 F.3d at 703, <u>Sonds</u>, 151 F.

19

Supp. 2d at 312.[11]

DeLeon contends that he requested an H. Pylori test on the same day that Dr. Genovese left.  As discussed <u>supra</u>, Dr. Genovese was not personally involved in his care after that date.  Moreover, as previously discussed, Dr. Genovese did provide appropriate treatment to DeLeon.  DeLeon contends that Dr. Genovese was on notice that H. Pylori was on the rise with inmates, as he claims is supported by the additional inmate affidavits he supplied.  For the same reasons as stated above, though, DeLeon failed to prove (1) that there was anything wrong with the water supply and (2) if something was wrong, the water provided a causal link to the alleged inmate illnesses.  This failure is further buttressed by Dr. Genovese affidavit, based on her medical training and opinion, that DeLeon's illnesses would not have been caused by the water and that his other ailments, particularly the mass on his buttocks, was not related to H. Pylori at all.  Accordingly, even viewing the facts in the light most favorable to him, DeLeon has failed to raise a question of material fact regarding Dr. Genovese' knowledge of any risk to DeLeon's health.

---

[11] While Dr. Genovese had already dep[arted Shawangunk during the period of time when DeLeon received the antibiotic therapy to treat his H. Pylori, the same argument holds true to defeat DeLeon's complaints against the medical department's decision to only treat him for a few weeks and then wait to retest him prior to beginning another course of antibiotic therapy.  While DeLeon disagrees with the facility policy not to have inmates on continual courses of antibiotics, such disagreement is insufficient to state an Eighth Amendment claim.  <u>Chance</u>, 143 F.3d at 703, <u>Sonds</u>, 151 F. Supp. 2d at 312.  Moreover, the medical department's actions in providing two weeks of treatment, then doing subsequent follow-up testing to ensure the treatment's effectiveness, refutes DeLeon's claims since the actions were taken to insure effective treatment for DeLeon's condition, not to ignore it.  Additionally, to the extent that medical defendants delayed in reporting the results of DeLeon's positive H. Pylori results to him, such a delay results in, at worst, medical negligence.  Such claims are insufficient to establish a constitutional violation.  <u>Chance</u>, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.") (citations omitted).

Furthermore, DeLeon's complaints that Dr. Genovese attempted to help him, but took the wrong course of action, also fail to support his claim.  Such statements are indicative of, at worst, negligence and not deliberate indifference.  As negligence is an insufficient basis for recovery, DeLeon's claims must also fail for that reason.  <u>Chance</u>, 143 F.3d at 703.

Accordingly, defendants' motion as to this claim should be granted on this ground.


### b. Dr. Das

It is undisputed that Dr. Das was a part-time employee of DOCCS, though DeLeon contends that he saw Dr. Das more often than Dr. Das recalled.  The medical records indicates that Dr. Das only saw DeLeon once in conjunction with a consultation for follow-up treatment for his eye.[12]  During this appointment, Dr. Das counseled DeLeon and ordered additional tests to check his cholesterol and ensure that it was not contributing to his diabetic retinopathy.  Such actions belie any claims of deliberate indifference.  Moreover, even if Dr. Das saw DeLeon multiple times, DeLeon has failed to raise a question of fact regarding deliberate indifference.  DeLeon contends that his eye issues were related to the H. Pylori infection.  However, for the reasons stated above, DeLeon has failed to proffer

---

[12]  DeLeon's major eye complaints occurred in July 2009, again after Dr. Genovese had departed the facility.  Liberally construing DeLeon's complaint, his contentions that the treatment he received in conjunction with his irritated eye was deliberately indifferent also fails.  First, DeLeon has failed to name as defendants medical personnel who were personally involved in the care and treatment of his eye.  Second, DeLeon was seen by medical personnel multiple times for his eye.  Moreover, records also indicate that DeLeon was prescribed medication during these visits.  Furthermore, the medical department had, both previously and subsequently, been observing DeLeon's eyes due to his visual complications caused by his diabetes.  Medical records indicate specialist referrals during his incarceration at Shawangunk as well as sick calls and other medical call-outs by the medical staff.  These records also belie any allegations of deliberate indifference.

evidence sufficient to establish a factual dispute over the cleanliness of the water or its proximate causation to his physical illnesses.  Furthermore, DeLeon's own actions in failing to ask subsequent specialists about the connection between his left eye ailments and the presence of H. Pylori also diminish his conclusory claims of causation.

Accordingly, defendants' motion as to this claim should be granted.


### E.  Issue Preclusion

Under the Full Faith and Credit Clause of the United States Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts within the state.  Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (citing Migra v. Warren City Sch. Dist., 465 U.S. 75, 81 (1984)).  "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  Allen v. McCurry, 449 U.S. 90, 94 (1980).


### 1. Res Judicata

 "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  Allen, 449 U.S. at 94 (applying res judicata to a 42 U.S.C. § 1983 action).  Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior

action."  Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000)

(citations omitted).  In New York State, the analysis is governed by the transactional

approach by which later claims are barred if they "aris[e] out of the same factual grouping

as an earlier litigated claim even if the[y are] . . . based on different legal theories or seek[]

dissimilar or additional relief."  Id.  The bar of res judicata will not apply where the original

forum is incapable of providing the relief requested by the plaintiff.  Id.; Davidson v.

Capuano, 792 F.2d 275, 278 (2d Cir. 1986).  Even if res judicata is inapplicable to a § 1983

action because the state court forum was incapable of awarding the requested relief, it does

not preclude the application of collateral estoppel.  See Phifer v. City of New York, 289 F.3d

49, 56 (2d Cir. 2002).

     As a threshold matter, it must be determined whether res judicata is an applicable

defense.  Here, DeLeon seeks compensatory and punitive damages from defendants after

losing his Court of Claims litigation.  Although "the Court of Claims possesses limited

jurisdiction . . . ," there is a cause of action "afforded for the recovery . . . of damages

resulting from injuries inflicted by an employee or officer of a state prison."  Wright v.

McMann, 387 F.2d 519, 523 (2d Cir. 1967) (citing N.Y. CORRECT. LAW § 6-b[13]).  However, in

such cases, the Court of Claims is limited in providing relief to plaintiffs.  "[C]ourts in this

---

     [13] This statute was amended in 1962, renumbered and amended again in 1970,
repealed in 1971, and subsequently encompassed within N.Y. Correct. Law § 24(2) which
provides:

          Any claim for damages arising out of any act done or the failure to
          perform any act within the scope of the employment and in the
          discharge of the duties of any officer or employee of the department
          shall be brought and maintained in the court of claims as a claim
          against the state.

Circuit have held that a suit in a forum where state employees may only be sued in their official capacities does not bar an action against those employees in their individual capacities." See Barrington v. New York, 806 F. Supp. 2d 730, 739-40 (S.D.N.Y. 2011) (citing cases).  Thus, because the Court of Claims was incapable of providing DeLeon with all of the monetary relief he seeks here, the claim is not barred by res judicata.

Therefore, defendants' motion for summary judgment on this ground should be denied.


**2. Collateral Estoppel**

In the alternative, defendants also raise the broader affirmative defense of collateral estoppel.  "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen, 449 U.S. at 94 (1980).  Collateral estoppel is applicable:

> [I]f (1) there has been a final determination on the merits of the issue
> sought to be precluded; (2) the party against whom . . . preclusion is
> sought has a full and fair opportunity to contest the decision. . .; and (3)
> the issue sought to be precluded by the earlier suit is the same issue
> involved in the later action.

Davis v. Halpern, 813 F.2d 37, 39 (2d Cir. 1987) (citation omitted).  The requirement of a full and fair opportunity to contest requires that the plaintiff "was fully able to raise the same factual or legal issues" in the prior litigation as asserted in the present case.  LaFleur v. Whitman, 300 F.3d 256, 274 (2d Cir. 2002).

Other courts have held that the application of Court of Claims decisions is appropriate for collateral estoppel because, "although the nature of a common law negligence claim is different than a federal civil rights claim, and although the Court of Claims action is brought

24

against the State and not the individual officers, there is a clear identity of issue between them warranting application of collateral estoppel." Shell v. Brun, 362 F. Supp. 2d. 398, 401 (W.D.N.Y. 2005); see also D'Andera v. Hulton, 81 F. Supp. 2d. 440, 446 (W.D.N.Y. 1999) (allowing collateral estoppel to preclude a federal civil rights case based upon issues decided during the prior Court of Claims trial because they "are dispositive of the issues to be determined in [the federal] action . . . .").

   In this case, preclusion is appropriate based on collateral estoppel.  First, there was a final determination in the Court of Claims action as the judge directed a verdict in the defendants favor, on the merits, after "hearing the proofs and allegations of the parties . . . ." Dkt. No. 45-11 at 2.  Second, DeLeon had the opportunity to present his case during the litigation, and providing his own testimony, provided the Court of Claims with the same documentation that has been used to support the present complaint and motion.  DeLeon Dep. at 75-76 (explaining that the proof that DeLeon provided to the Court of Claims was "[a]ll [his] evidence that [he] got over here, the things that [he] made out to the Federal Court to support [his] Federal lawsuit.").  Third, as demonstrated by reading the Court of Claims complaint and DeLeon's testimony, the underlying factual basis of both claims is identical -- taking issue with the medical treatment provided to him in the face of allegedly contaminated water which DeLeon asserts resulted in his H. Pylori infection.
Thus, it is clear that there was a final determination on the merits and the issues in contention between the parties in the prior Court of Claims decision and the case at hand are identical.

   Therefore, in the alternative, defendants' motion for summary judgment should be granted on this ground as well.

### III. DeLeon's Motion

For the reasons discussed above, DeLeon's motion for summary judgment should be dneied in all respects.

### IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. DeLeon's motion for summary judgment (Dkt. No. 44) be **DENIED** in all respects; and

2. Defendants' cross-motion for summary judgment (Dkt. No. 45) be **GRANTED** as to all defendants and all claims**.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  July 5, 2012
        Albany, New York                 _David R. Homer_

                                          United States Magistrate Judge

26